UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

STAYMOBILE VENTURE LLC,

      Debtor.

                               /

Case No. 22-43781
Chapter 7
Hon. Lisa S. Gretchko

## BLUUM USA, INC.'S OBJECTION TO TRUSTEE'S MOTION TO COMPROMISE AND SETTLE CLAIMS AGAINST BRIAN EISENBERG, KENNETH EISENBERG, AND STEPHEN EISENBERG, KENWAL INVESTMENT GROUP, LLC, FRANK JERNEYCIC, HONIGMAN LLP, ALAN SCHWARTZ, AND MATHEW RADLER

### (Evidentiary Hearing Requested)

Bluum USA, Inc. ("**Bluum**"), the largest creditor of the above styled Debtor's estate, files its Objection to Trustee's Motion to Compromise and Settle Claims Against Brian Eisenberg, Kenneth Eisenberg, and Stephen Eisenberg, Kenwal Investment Group, LLC, Frank Jerneycic, Honigman LLP, Alan Schwartz, and Mathew Radler (the "**Objection**").

### PRELIMINARY STATEMENT

Bluum is the largest creditor of the Debtor's estate alleging damages that exceed $23,000,000 that continue to accrue from unfulfilled warranty claims by Bluum's customers. Bluum's damages were primarily caused by the parties the Trustee seeks to grant broad releases under the settlement that is the subject of this Objection. The proposed settlement is unreasonable under any objective standard

because, *inter alia*: (i) the settlement provides releases to various parties that provide no consideration under the settlement; (ii) the settlement includes a request for the entry of a bar order where there is no factual or legal basis supporting the requested relief; (iii) the settlement consideration is inadequate given that all of the released parties lack viable defenses and have sufficient assets to satisfy a money judgment equal to the released claims. The timing for approval of this settlement is suspect given that a mediation with Judge Phillip Shefferly is scheduled for February 26, 2024 and the consideration terms offered to the Trustee in this settlement are in all probability the identical terms offered at the outset of this case. Finally, after accounting for Chapter 7 administrative expense claims, it is highly probable that the creditors of the Debtor's estate will receive a nominal distribution from the proceeds of the settlement.

## I.    Background

1.    StayMobile Venture LLC (the "**Debtor**") filed the above-captioned bankruptcy ("**Bankruptcy Case**") on May 9, 2022 ("**Petition Date**").

2.    Bluum is the largest unsecured creditor with aggregate claims in excess of $23,000,000. *See* Claims Nos. 50 and 70.

3.    Prior to the Petition Date, Staymobile provided electronic repair warranty and protection programs for businesses, schools, and consumers. Bluum

contracted with StayMobile to sell StayMobile's warranties to school districts that bought laptops and other devices from Bluum.

4.     To obtain Bluum's business, StayMobile's officers represented to Bluum that the company was adequately capitalized and could service the warranties.  Unfortunately, this was not the case.  Insiders were pulling out millions of dollars, and granting themselves liens on Debtor's assets to effectively secure their otherwise mandatory capital requirements, leaving the Debtor undercapitalized to service the warranties it had already been paid for, and overleveraged.

5.     After StayMobile collapsed and filed for bankruptcy, Bluum had to provide substitute warranty services for school districts, resulting in millions of dollars of claims by Bluum against the estate.

6.     Since the outset of this case, Bluum has been investigating the fraud perpetrated on Bluum by Debtor and its insiders.

7.     Debtor's sole member and manager is Kenwal Investment Group, LLC ("**Kenwal**" or "**Owner**"). Kenwal is owned by Brian Eisenberg, Kenneth Eisenberg and Stephen Eisenberg (collectively, the "**Eisenbergs**" or "**Insiders**").

8.     The Statement of Financial Affairs reflects that over $4.25 million was transferred to Brian Eisenberg in the two years prior to the Petition Date (ECF No. 172-2, p. 22.)

9.    The Eisenbergs filed proofs of claims in this Bankruptcy Case for purported loans to Debtor totaling over $7,000,000 (ECF Nos. 58, 59, 60) ("Insider Claims"). Notably, Debtor's records classify over $3.4 million of these "loans" as equity infusions, and $3,000,000 as forgiven in a debt-to-equity conversion. The Eisenbergs also granted themselves security interests in Debtor's assets for $2,500,000 that was "loaned" to Debtor less than a year prior to the petition date ("**Preference Liens**"), and on the tail of an equity distribution of $1.9 million, according to Debtor's records. In other words, the Eisenbergs appear to have unlawfully securitized a mandatory capital obligation.

10.    In addition to the Eisenbergs, there appear to be other cognizable claims against the Owner, Debtor's former management, and Debtor's former professionals.

11.    For example, Owner gave a release of Debtor's former CEO, Brian Hutto, in exchange for effectively no consideration. Bluum and Trustee have contended that this was a fraudulent transfer.

12.    Additionally, despite obvious conflicts of interest, the law firm, Honigman LLP ("**Honigman**"), represented both the Debtor and the Eisenbergs prior to the Petition Date, potentially on both sides of the suspect release of Brian Hutto and other transactions which were unfavorable to Debtor, and Honigman continues to represent the Eisenbergs in this bankruptcy.

13. Because the Debtor's estate only netted $970,000 from the sale of its other assets, before expenses, the Chapter 5 claims and state law claims against the Owner, Insiders, and Debtor's former officers, directors, and professionals are the single largest asset of the estate, which has a total claim pool of over $51.8 million. Notably, the Insider Claims represent only 13% of the estate.

14. Both the Trustee and Bluum moved for early discovery of the Insiders and Owner (ECF Nos. 108, 143). However, at a hearing held on August 19, 2022, the Trustee withdrew his discovery based upon an alleged global settlement the Trustee was negotiating with Insiders and Owner. Bluum also agreed to withdraw its discovery without prejudice to preserve judicial economy and ultimately review the terms of any alleged global settlement.

15. Nine months elapsed, and Trustee did not commence any claims against Debtor's Insiders or Owner, and or propose any settlement of claims.

16. Therefore, Bluum moved forward with discovery again. Bluum moved for an order to issue Rule 2004 subpoenas to the Debtor's former CEO and CFO, which this Court granted (ECF Nos. 377, 403).

17. Shortly thereafter, Trustee and Bluum moved for orders to issue subpoenas to the Insiders (ECF No. 401, 432) and Frank Jerneycic ("**Jerneycic**"), an purported officer of Debtor and an officer of an affiliate, who admits that he

provided financial advice to Debtor (ECF No. 402), which were granted by the Court (ECF No. 454).

18.     After conducting extensive discovery, including reviewing financial records and communications, Bluum and the Trustee now possess substantial evidence that support the disallowance of the Preference Liens as disguised equity and the avoidance of at least $4.5 million in transfers to the Eisenbergs.  In addition, substantial evidence supports claims for malpractice against Honigman given their blatant conflicts of interest in representing both sides of prepetition transactions between Debtor and its insiders.

19.     The Trustee has not yet conducted the 2004 exams of the most crucial witnesses, and targets of his claims, and the deadline for the Insiders and Jerneycic's 2004 examinations was recently extended to March 15, 2024 (ECF No. 483, 84).

20.     Nonetheless, (1) on the eve of Bluum's mediation, (2) premised on substantially better claims now with evidentiary support, (3) after the Debtor's estate has incurred significant legal fees and costs to obtain the necessary evidentiary support to pursue the claims, the Trustee filed his *Motion to Compromise and Settle Claims Against Brian Eisenberg, Kenneth Eisenberg, and Stephen Eisenberg, Kenwal Investment Group, LLC, Frank Jerneycic, Honigman LLP, Alan Schwartz, and Matthew Radler* (ECF No. 481) (the "**Motion to Compromise**") seeking approval of the settlement agreement detailed therein (the "**Settlement**

**Agreement**").  The settlement terms in the Settlement Agreement are *far worse* than the settlement terms that appear to have been available to the Trustee at the outset of this case.  Upon information and belief, the Trustee did not solicit nor receive any input from holders of non-insider claims prior to moving forward with the Settlement Agreement and the Motion to Compromise.

21.    The consideration in the Settlement Agreement provided by the Debtor's insiders and former professionals is grossly inadequate given the magnitude of the releases.  Coupled with the additional extraordinary remedy of a bar order for zero additional consideration than what was initially offered, the Settlement Agreement fails to pass the lowest threshold required for approval.

## II.    Settlement Agreement

22.    In the Settlement Agreement, in exchange for a payment of $750,000[1] from the Insiders, avoidance of the Preference Liens, and waiver of the Insider Claims, the Trustee gives broad releases and bar order to the Insiders *but also* to the Owner, Jerneycic, Honigman, and Alan Schwartz and Matthew Radler ("Honigman Attorneys") (collectively, the "Settling Parties") – in exchange for zero consideration from them.

---

[1] In essence a partial return of sums fraudulently transferred to the Debtor's insiders.

23.     Apart from the cash of $750,000, the rest of the settlement consideration that the Trustee is receiving is effectively illusory. The avoidance of the Preference Liens is of negligible value given the strength of the preference claim and the minimal assets subject to such lien, totaling less than $970,000 before expenses. Likewise, the waiver of the unsecured remainder of Insider Claims, totaling $4 million is of negligible value given the magnitude of the claim pool of over $51 million.

24.     In exchange for $750,000, the Trustee releases a broad swath of vaguely described claims (the "Settled Claims")[2] (ECF No. 481, pp. 19-20), namely:

a)     A fraudulent transfer claim against Owner only as a result of a settlement agreement and release with former Chief Executive Officer of the Debtor Brian Hutto under Section 548 of the Bankruptcy Code and under MCL 566.31, *et seq.*, through Section 544 of the Bankruptcy Code ("Hutto Claims");

b)     Fraudulent transfer claims against Brian Eisenberg under Section 548 and 549 of the Bankruptcy Code and under MCL 566.31 et seq., through Section 544 totaling over $4,506,361 (the "Insider Transfers"), made in the four years prepetition;

c)     Fraudulent transfer claims under Section 548 of the Bankruptcy Code and under MCL 566.31, *et seq.*, through Section 544 of the Bankruptcy Code against Honigman, Owner, and the Eisenbergs for funds paid by the Debtor to Honigman for legal services provided to third parties for which the Trustee asserts reasonably equivalent value was not received by the Debtor.

---

[2] The Settlement Agreement also includes the avoidance of the Preference Liens as a "settled claim" to which releases and a bar order apply. However, the Preference Liens are avoided per a separate settlement term.

d)   Breach of Fiduciary Duty claims against Owner and Brian M. Eisenberg only regarding the Insider Transfers.

e)   Breach of Fiduciary Duty claims against Honigman, and Honigman Attorneys regarding the Hutto Claims

f)   Breach of Fiduciary Duty (Aiding and Abetting) claims against the Eisenbergs, Jerneycic, Honigman, and Honigman Attorneys regarding (A) causing Debtor to sell Cellairis Bundle, the Constant Connectivity Warranty Program ("CCWP1"), and the Second Constant Connectivity Program ("CCWP2") at a loss, (B) causing the Debtor to use the revenues from its sale of the CCWP1 and CCWP2 warranties to service unfunded or underfunded warranty obligations, (C) causing the Debtor to fail to maintain any reserves to service future warranty obligations, (D) causing the Debtor to fail to fund premiums for CLIP, and (E) causing the Debtor to engage in the Insider Transfers; and

g)   Legal Malpractice claim against Honigman, Alan S. Schwartz, and Matthew E. Radler.

25.   Most concerning, however, is the proposed settlement's provision for a bar order barring any and all persons served with the proposed settlement motion from ever asserting claims "relating to or arising from" the Settled Claims, against the Insiders, as well as the rest of the Settling Parties who have paid absolutely no consideration to Trustee for releases, let alone a bar order.

### III.   Basis for Objection

26.   Bluum objects to the approval of the proposed Settlement Agreement as (1) the Motion to Compromise omits crucial information about the merits, strength, and magnitude of the majority of the released claims, and zero insight on the collectability of the releasees, making it impossible to determine whether the

settlement is in the best interests of the estate, (2) the settlement amount is grossly inadequate, and (3) the proposed Settlement Agreement includes prejudicial and unsupported bar orders in favor of fully collectible individuals and entities who have given nothing in exchange for same.

27.     The Motion to Compromise should be denied as insufficient on its face, or in the alternative, Bluum requests (A) an evidentiary hearing on the merits of the proposed settlement, and (B) to stay the determination of the settlement until the Supreme Court rules on a bankruptcy court's power and jurisdiction to issue a bar order enjoining a third party's pursuit of claims.

### IV.    Objection and Incorporated Memorandum of Law

#### A.    The Motion Does Not Provide Sufficient Information to Evaluate the Proposed Settlement

28.     In order to approve a compromise, a Court must ensure a proposed compromise is fair, equitable, and in the best interests of the estate, by a "review the particular facts and circumstances with adequate detail and explanation." *Matter of Jackson Brewing Co*., 624 F.2d 605, 607 (5th Cir. 1980). "There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." *Protective Comm. for Indep. S'holders of TMT Trailer Ferry,*

*Inc. v. Anderson* ("*TMT Trailer*"), 390 U.S. 414, 424, 88 S. Ct. 1157, 1163, 20 L. Ed. 2d 1 (1968).

29.     Courts consider four factors to determine if a settlement is beneficial to the estate: (1) the probability of success in the litigation, (2) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it, (3) the difficulties, if any, to be encountered in the matter of collection, and (4) the paramount interest of creditors and a proper deference to their reasonable views in the premises. *In re Bard*, 49 F. App'x 528, 530 (6th Cir. 2002); *Matter of Jackson Brewing Co.*, 624 F.2d at 607; *In re Woodson*, 839 F.2d 610, 620 (9th Cir. 1988).

30.     In particular, a party seeking approval of a settlement should explain "how the strengths and weaknesses of the debtor's causes of action were evaluated." *TMT Trailer*, 390 U.S. at 434.  It is not enough to support a settlement by merely stating that the alternative is extensive litigation at heavy expense and unnecessary delay because "[l]itigation and delay are always the alternative to settlement", and whether that alternative is worth pursuing necessarily depends upon a reasoned judgment as to the probable outcome of litigation.  *Id.*  Therefore, it is a basic part of the settlement approval process for the Court to "compare the terms of the compromise with the likely rewards of litigation." *Id.* at 424.

31.     Where a compromise is not "grounded in clear support in the record", it cannot be approved.  *Matter of Jackson Brewing Co.*, 624 F.2d at 607.

32.     The Motion for Compromise provides almost no information on the merits, strength, and likely rewards of the majority of the settled claims. For example, the Trustee does not specify the basis for the legal malpractice claims against Honigman and the attorneys, what transactional or litigation work such malpractice claim arose from, and the magnitude of damages that would be available from such claim. In fact, apart from the Insider Transfers, which total over $4,506,361, the Trustee has not at all substantiated the potential value of *any* of the other claims.

33.     The Trustee has not provided any information about the collectability of the releasees either. The Eisenbergs are believed to be people of substantial wealth, and Honigman, a AmLaw 200 firm, would clearly be collectible. The collectability of the Settling Parties is a factor that is necessary to consider when determining if the settlement is in the best interests of the estate, but the Trustee has provided no information for the Court on this factor.

34.     While the Trustee generally makes the blanket assertion that "the Settling Parties have asserted defenses to each of these claims and have denied any liability therefor", the Trustee fails to specify any defenses or assess the merits of same or the likelihood of prevailing. All the Trustee says is that the Settling Parties "would vigorously defend such litigation" and with "highly qualified counsel."

35.     Besides for these conclusory statements speculating about the vigor of the defense, the Motion for Compromise provides little other information about the likelihood of success in litigation.  Because the Motion to Compromise provides insufficient information to evaluate the proposed settlement, it should be denied.

**B.      The Settlement Amount is Grossly Inadequate**

36.     One of the primary factors for a court to consider is the "probability of success in the litigation." *In re Bard*, 49 F. App'x at 530.  Because the Trustee has provided almost no information about the value of the claims, or merits of the defenses, the Motion to Compromise entirely fails to support that the proposed settlement amount is in the best interests of the estate.

37.     The payment of $750,000, which only the Insiders are obligated to pay, is less than 20% of the over $4.5 million of Insider Transfers, which would be some of the most straightforward fraudulent transfer claims to litigate.  The other settling defendants pay *nothing* for their respective releases and bar orders. It is hard to imagine how the Trustee could have gotten less than nothing.  And, if the Insiders only agree to the settlement if their attorneys are released and given a bar order as well, it raises the question of whether their attorneys (who are still representing them in settlement negotiations), should be disqualified for a blatant conflict of interests in representing them and demanding their own releases and bar order that their clients will pay for per the proposed settlement.

38.     Further, it is patently obvious that the releases in favor of the non-paying Settling Parties (Jerneycic, Honigman and the Honigman Attorneys) are *not* appropriate or necessary to the settlement, given that the settlement is nearly the exact same magnitude as that proposed at the beginning of the case, but with the addition of gratuitous releases.

## C.     The Settlement Contains Prejudicial and Unsupported Bar Orders

39.     In determine whether to enter a bar order, a district court must determine whether it has jurisdiction to enjoin the potential claims, whether it has the power to enter the order, and closely scrutinize the bar order's scope.  *In re Greektown Holdings, LLC*, 728 F.3d 567, 578 (6th Cir. 2013).   Significantly, "[n]o court has authorized barring claims with independent damages." *Id*. at 579.  "A bar order that enjoins independent claims and provides no compensation is problematic to say the least." *Id*.

40.     The Settlement Agreement has an immensely broad bar order provision, in relevant part as follows:

> This Settlement Agreement will be effective upon entry by the Bankruptcy Court of an order, in form and substance acceptable to the Trustee and Settling Parties, barring the commencement of continuation of litigation of the Claims, and approving this Settlement Agreement (the "Approval Order"). . . The Approval Order shall contain a provision barring the commencement or continuation litigation of the Claims substantially in the form as follows (with any changes to such provisions by the Bankruptcy Court being subject to the approval of the Settling Parties):

Bar of Litigation of Claims: The entry of this Order constitutes the Bankruptcy Court's approval of the compromise and settlement of all claims, actions, causes of action, and controversies against the Settling Parties. . . For good and valuable consideration, all creditors of the Debtor who are served with notice of the Trustee's Motion to Compromise (seeking approval of this Settlement Agreement) are hereby permanently BARRED, ENJOINED and RESTRAINED from (i) commencing, continuing, prosecuting, or asserting, in any manner, any action or proceeding of any kind in respect of the Claims against the Settling Parties, whether arising as claims, cross-claims, counterclaims, or third-party claims, in any federal or state court, or in any other court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere and (ii) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or other order against any of the Settling Parties **relating to or arising from** the Claims, (collectively, the "Barred Claims"). Such injunction with respect to the Barred Claims shall extend to any successor, assign, heir, beneficiary, executor, and representative of or to the Settling Parties.

*See* ECF No. 481, pp. 21-22.

41.    The Sixth Circuit has found similarly broad bar orders that bar claims "arising out of or reasonably flowing from" both the facts and allegations of the settled proceeding and settled fraudulent transfer claims to be overly broad because they have the potential to bar claims for independent damages.  *In re Greektown Holdings, LLC*, 728 F.3d at 578.  Where a settled claim "does not involve potential claims for contribution or indemnity", then a bankruptcy court "might very well determine that a bar order would be inappropriate."  *Id*. n. 9.

42.     Despite the Trustee's contention that the barred claims are narrowly only those claims that the Trustee could raise (*i.e.*, only claims owned by the estate), the actual description of the barred claims is not so circumscribed.  Indeed, the bar order, which is the first provision of the Settlement Agreement and therefore apparently the focus of the settling parties, could apply to claims owned by individual creditors, including Bluum.  The bar order extinguishes personal property rights, the creditors' state law actions, that do not belong to the bankruptcy estate.

43.     For example, one of the defined claims is breach of fiduciary duty (aiding and abetting) against the Eisenbergs, Jerneycic, Honigman, and the Honigman Attorneys for "[c]ausing the Debtor to fail to maintain any reserves to service future warranty obligations."  One of Bluum's chief contentions from the start has been that the Debtor was intentionally underfunded to service its warranties that Bluum is now forced to cover – despite Debtor's express representations to the contrary.  Bluum's various state law claims against these parties for intentionally underfunding the Debtor would certainly "relate to or arise from" the Trustee's claim for breach of fiduciary duty for underfunding the reserves.  The Trustee and the Eisenbergs have actual knowledge that these are claims that Bluum is currently pursuing and are subject to the Mediation planned for later this month.

44.     In sum, the release and bar order is just too broad to be reasonable, or appropriate for this matter.  Especially where the majority of the settling parties have paid zero consideration for such bar order.

45.     Lastly, the Trustee's representations as to why the bar order is needed are conclusory and unsupported.  For example, the Trustee states that the releasees would have claims for indemnification/contribution, but has failed to explain any source of such indemnification or contribution, and it does not seem obvious that there would be any such obligation running to Debtor's former professionals, or Debtor's insiders who are not directors or officers of the Debtor that would potentially be entitled to indemnification under statute or the Debtor's operating agreement.

**D.     If the Motion is Not Denied, an Evidentiary Hearing is Necessary**

46.     Rule 9019 requires a "notice and a hearing" prior to approving a compromise or settlement.  In determining whether to approve a proposed compromise, "the bankruptcy court is charged with an affirmative obligation to apprise itself of all facts necessary to evaluate the settlement and make an informed and independent judgment as to whether the compromise is fair and equitable.  *In re Bard*, 49 F. App'x 528, 530 (6th Cir. 2002) (citations and internal quotation marks omitted).

47. If the Court does not deny the Motion to Compromise, an evidentiary hearing is warranted. Simply stated, the Court's obligations of a comprehensive and complete review of the merits of the claims being settled cannot be satisfied on a motion calendar hearing. The Trustee should be required to set forth evidence which supports the proposed settlement of the claims, with Bluum and other creditors having the chance to oppose such evidence, with *inter alia,* evidence concerning the viability and merits of claims that could potentially be barred by the proposed settlement. In advance of such evidentiary hearing, Bluum intends to propound discovery on the Trustee to support its objection that the Trustee did not properly use good business judgment in agreeing to the proposed settlement. Moreover, Bluum would also need to complete the 2004 exams of the Eisenbergs that have been continued by the agreement of the parties.

48. Likewise, the Court will have to analyze a multi-factor test on whether to grant a bar order, *see In re Greektown Holdings, LLC*, 728 F.3d at 578, and an evidentiary hearing is necessary and proper for the Court to determine same.

**E.    The Court Should Await the Outcome of Perdue Decision from the Supreme Court**

49. The issue of third party bar orders is squarely before the United States Supreme Court in *Harrington v. Purdue Pharma, L.P*, No. 23-124 and the Supreme Court has expressed clear reservations with the validity of third-party releases. *See*

excerpt of hearing transcript, attached hereto as Exhibit 1. Justice Kagan noted, for

example:

> Justice Kagan:      Mr. Garre, as I suggested to Mr. Gannon, I thought that one of the government's stronger arguments is this idea that there's a fundamental bargain in bankruptcy law, which is you get a discharge when you put all your assets on the table to be divided up among your creditors. And I think everybody thinks that the Sacklers didn't come anywhere close to doing that. And the question is, why should they get the discharge that usually goes to a bankrupt person once they've put all their assets on the table without having put all their assets on the table?
> . . .
> But I guess what I am suggesting is that this is a fundamental principle of bankruptcy law, and when we're trying to figure out what powers it gives to the bankruptcy court and what not, it would be a kind of extraordinary thing if we gave the power to -- to basically subvert this basic bargain in bankruptcy law.

*See* Ex. 1, pp. 63 -64.

50.     In response to one of the parties arguing that collectability issues

weighed in favor of approving the bar order as "necessary" to the reorganization,

Justice Jackson questioned the necessity for any bar order as a matter of law:

> Justice Jackson:      . . . it's not like by operation of law it's necessary to do this. It is necessary to do this because the Sacklers have taken the money and are not willing to give it back unless they have this condition.

*See* Ex. 1, p. 68.

> But your – you define "necessary," as I understand it, as anything the Sacklers require . . .

*See* Ex. 1, p. 81.

...
Since the linchpin fact here, as you've articulated it, is the Sacklers' willingness to put money into the estate, why can't the -- and that it's necessary insofar as the Sacklers are demanding it in this situation -- . . . why can't they demand anything and -- and let that be necessary?

*See* Ex. 1, pp. 81-82.

51.     The releases at hand go beyond those at issue in *Perdue*. Here, the releases inexplicably extend to third parties that provide **no** consideration under the Settlement Agreement.

52.     Because significant binding authority concerning the validity of third party bar orders, and the standard for granting same, will be determined in *Perdue*, this Court should await the coming decision before determining that the Settling Parties are entitled to any bar order, much less a suspect bar order that provides nothing to the estate, and does not involve any claims for contribution or indemnity.

## V.     Conclusion

Notwithstanding the deference given to a Trustee's exercise of business judgment in entering into settlements on behalf of the estate, this Court should deny approval of this settlement in light of (1) the lack of information provided by the Trustee about the merits, defenses, and likely rewards of claims settled, (2) the grossly inadequate consideration received from certain parties and the utter absence of consideration from the majority of parties, and (3) the overbroad and unsupportable bar order requested.  Even if the Court were to consider the Motion

to Compromise, it should hold full evidentiary hearing on the merits, and stay consideration in light of the *Perdue Pharma* decision expected to come from the Supreme Court by June.

**WHEREFORE**, Bluum USA, Inc. respectfully requests that the Motion to Compromise be denied, or alternatively that the Court set an evidentiary hearing and await the Supreme Court decision in Perdue Pharma before approving the requested bar orders, and for all other relief that is just and proper.

Dated: February 15, 2024                    Respectfully submitted,

SCHAFER AND WEINER, PLLC

/s/ Joseph K. Grekin
JOSEPH K. GREKIN (P52165)
JEFFERY J. SATTLER (P72733)
*Counsel for Bluum, USA, Inc.*
40950 Woodward Ave., Ste. 100
Bloomfield Hills, MI 48304
(248) 540-3340
jgrekin@schaferandweiner.com
jsattler@schaferandweiner.com

*-and-*

AKERMAN LLP
Eyal Berger, Esq.
Florida Bar No: 011069
(admitted pro hac vice)
201 E. Las Olas Blvd., Suite 1800
Fort Lauderdale, Florida  33301
Tel: (954) 463-2700
Fax: (954) 463-2224
eyal.berger@akerman.com
*Attorneys for Bluum, USA, Inc.*